UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

JARON ANTHONY MARTES,                          :

               Plaintiff,                :          <u>OPINION AND ORDER</u>

         -against-                :
                                17 Civ. 5772 (GWG)
COMMISSIONER OF SOCIAL SECURITY,               :

            Defendant.            :
------------------------------------------------------------x

GABRIEL W. GORENSTEIN, United States Magistrate Judge

Plaintiff Jaron Anthony Martes brings this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Commissioner of Social Security (the

"Commissioner") denying his claim for Supplemental Security Income and Disability Benefits

under the Social Security Act (the "Act"). Both parties have moved for judgment on the

pleadings pursuant to Federal Rule of Civil Procedure 12(c).[1] For the reasons stated below,

Martes's motion is denied and the Commissioner's motion is granted.

I. <u>BACKGROUND</u>

    A. <u>Procedural History</u>

Martes applied for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") on November 5, 2013. <u>See</u> Certified Administrative Record, filed Jan. 8, 2018

(Docket # 15) ("R."), at 10, 73-74. He alleged that his disability began on July 1, 2013, the date

---

[1] Notice of Motion, filed Mar. 8, 2018 (Docket # 17); Memorandum of Law in Support
of the Plaintiff's Motion for Judgment on the Pleadings, filed Mar. 8, 2018 (Docket # 18) ("Pl.
Mem."); Notice of Cross-Motion, filed May 8, 2018 (Docket # 19); Memorandum of Law in
Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of the
Commissioner's Cross-Motion for Judgment on the Pleadings, filed May 8, 2018 (Docket # 20)
("Comm'r Mem."); Reply Brief for the Plaintiff, filed May 23, 2018 (Docket # 21) ("Pl. Reply
Mem.").

he was injured in a car accident, when he was 33 years old.  R. 10, 17, 286.

The Social Security Administration ("SSA") denied Martes's applications and Martes sought review by an Administrative Law Judge ("ALJ").  R. 75, 83, 85.  An initial hearing was held on January 12, 2016, before an ALJ.  R. 47-60.  A supplemental hearing was held on June 15, 2016, before the same ALJ.  R. 31-46.  In a written decision dated August 22, 2016, the ALJ found Martes not disabled within the meaning of the Act.  R. 7-19.  On May 31, 2017, the Appeals Council denied Martes's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  R. 1-6.  This action followed.

B.  The Hearing Before the ALJ

Martes was represented by attorney David Levine at his hearings before the ALJ.  R. 31, 47.  Because the ALJ had not received any records for medical appointments occurring after May 2014 prior to the initial hearing held in January 2016, the initial hearing was limited to oral testimony from Martes as to his treatment during the period of May 2014 through January 2016.  See R. 50-52.  Martes testified to seeing two physicians in that time: Dr. Emmanuel Lambrakis for pain management and Dr. Eli Witt for psychiatric counseling.  R. 55, 56-57.  He also referred to a primary care physician at Montefiore Medical Center whom he saw for referrals.  R. 54.

At the June 15, 2016, hearing, Martes testified that prior to the car accident he worked in customer service at a retail store, as well as "some delivery and moving type work," and maintenance.  R. 36.  After the accident, however, he began to experience knee, neck, and back pain.  R. 37, 38-39.  He felt radiating pain from his neck into his spine and his hands and arms sometimes shook due to his neck pain.  R. 43.  He also experienced sharp pains in his lower back, radiating "sometimes" to his legs.  R. 43.  Because of his pain, he estimated that he could stand no more than 15 minutes at a time, R. 44, and that in an eight-hour period he would spend

2

"most of the time . . . laying down somewhere," R. 45. If he instead spent the time sitting, he would experience back pain. R. 45. To cope with this pain, Martes takes several medications — namely, Oxycodone, Xanax, and Motrin — that cause him to experience incoherence, difficulty walking, dizziness, and memory problems. R. 37-38. As a result of the pain and the side effects of his pain medication, he said he could no longer perform his prior work. R. 37. Martes underwent surgery on his knee, but he did not have any improvement as a result. R. 38. He turned down a recommendation that he undergo a second surgery because he did not want it. R. 38. Martes also reported seeing a psychiatrist for anxiety and trouble sleeping. R. 39.

Martes was 36 years old at the time of the hearing. R. 35. He testified to having two children and recently living with them, though he had since moved in with his mother. R. 36, 40. He stated that he spent most of his days sleeping and reported that he is unable to take care of his children as a result of the drowsiness associated with his medications, though he used to take care of them. R. 40-41. He did not drive or perform activities of daily living, like cleaning or cooking, relying on his mother for these activities. R. 41. He also did not "associate with public transportation" because of the side effects from his medication. R. 42. He used to have hobbies, but no longer had any. R. 42. Instead he spends his time "try[ing] to sleep," so that the effects of his medication "wear off." R. 41.

C. The Medical Evidence

Both Martes and the Commissioner have provided summaries of the medical evidence contained in the administrative record. See Pl. Mem. at 1-5; Comm'r Mem. at 4-10. The summaries are substantially consistent with each other. The Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see Scheduling

Order, filed Jan. 10, 2018 (Docket # 16), ¶ 5, and neither party has done so.[2]  Accordingly, the

Court adopts Martes's and the Commissioner's summaries of the medical evidence as accurate

and complete for purposes of the issues raised in this suit.  We discuss the medical evidence

pertinent to the adjudication of this case in section III below.

    D.  The ALJ's Decision

    The ALJ denied Martes's application for DIB and SSI on August 22, 2016.  R. 7.

Following the five-step test set forth in SSA regulations, the ALJ found at step one that Martes

had not engaged in "substantial gainful activity since July 1, 2013, the alleged [disability] onset

date."  R. 12.  At step two, the ALJ found that Martes had the following severe impairments:

"status post arthroscopic repair of the left knee, L4-5 disc bulge and straightening of the lumbar

lordosis, disc bulges of the cervical spine at C4-C5 and C5-C6, as well as straightening of the

cervical lordosis."  Id.  The ALJ also noted that Martes had the "non-severe impairments" of

high blood pressure, childhood asthma, right shoulder surgery, and "adjustment disorder with

mixed anxiety and depressed mood."  R. 13.  At step three, the ALJ concluded that none of

---

[2]  Martes does object to the Commissioner's references in her brief to the guilty plea of
Martes's pain management doctor, Dr. Emmanuel Lambrakis, to writing unnecessary medical
prescriptions for Oxycodone.  See Pl. Reply Mem. at 2 n.1.  We agree that there is no such
evidence in the administrative record and thus we do not consider it.  See 42 U.S.C. § 405(g)
("The court shall have power to enter, upon the pleadings and transcript of the record, a
judgment affirming, modifying, or reversing the decision of the Commissioner of Social
Security.") (emphasis added).

    Martes's brief, see Pl. Reply Mem. at 2 n.1, also disputes that Martes even saw Dr.
Lambrakis because the medical records at issue are preceded by a page that refers to a Dr. Steve
Losik, R. 365.  However, Martes testified at his initial hearing that Dr. Lambrakis was treating
him.  R. 55.  Also, Dr. Steve Losik, "Board Certified Radiologist," separately signed radiology
reports with a heading that associates him with Westchester Radiology and Imaging.  R. 389-93.
These reports are indexed in the record in the same exhibit (No. 12F) as the pain management
records from Dr. Lambrakis's office.  Accordingly, we proceed on the assumption that Dr.
Lambrakis was the physician who made the notes appearing in the Administrative Record at
pages 366 to 388.

Martes's severe impairments singly or in combination met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). R. 14-15. The ALJ considered Listings 1.02 and 1.04, determining that Martes did not exhibit the necessary medical criteria. Id. Before moving to step four, the ALJ assessed Martes's residual functional capacity ("RFC"). R. 14. The ALJ determined that Martes retained the RFC "to perform sedentary work . . . except [Martes] is limited to occasionally climbing, balancing, kneeling, stooping, crouching and crawling." R. 15-17. In making this determination, the ALJ accorded varying weights to the opinions of Dr. Seema Rai, Dr. Ksenia Pavlova, and Dr. Eli Witt. Id. Having determined Martes's RFC, the ALJ evaluated at step four whether Martes could continue his past work "as a maintenance worker, stocker, and youth monitor," concluding that he no longer could. R. 17. At step five, because the ALJ found that Martes retained the RFC to perform the "full range of sedentary work" with "additional limitations [that] have little or no effect on the occupational base of unskilled sedentary work," the ALJ determined that the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 201.28 directed a finding of "not disabled" under the Act. R. 18.

## II. GOVERNING STANDARDS OF LAW

### A. Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive . . . ."). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted). Importantly, it is not a reviewing court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v.

Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

    B.  <u>Standard Governing Evaluation of Disability Claims by the Agency</u>

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); <u>accord</u> <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); <u>Craig v. Comm'r of Soc. Sec.</u>, 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>see also</u> <u>Burgess</u>, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R.

§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. part 404, subpart P, appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience.  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

 C.  The "Treating Source" Rule

 In general, the ALJ must give "more weight to medical opinions" from a claimant's treating sources when determining if the claimant is disabled.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician").  Treating sources "may bring a unique perspective to the medical evidence that

cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ must accord "controlling weight" to a treating source's medical opinion as to the nature and severity of a claimant's impairments but only if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); accord Selian, 708 F.3d at 418 ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.") (citations omitted). Inversely, the opinions of a treating source "need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted).

If the ALJ does not give controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for the weight given to that opinion or face remand. See Greek, 802 F.3d at 375 (quoting Burgess, 537 F.3d at 129-30). When assessing how much weight to give the treating source's opinion, the ALJ should consider the factors set forth in the Commissioner's regulations, which are (I) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant factors. See 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to

the factors" listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(2)-(6)).  The Second Circuit has

stated that it will "not hesitate to remand when the Commissioner has not provided 'good

reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding

when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for

the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; see also Greek,

802 F.3d at 375-77.  However, a "slavish recitation of each and every factor" is unnecessary

"where the ALJ's reasoning and adherence to the regulation are clear." Atwater v. Astrue, 512 F.

App'x 67, 70 (2d Cir. 2013).

III.  DISCUSSION

    Martes raises five grounds for reversing the ALJ's decision: (1) the ALJ "erred in not

fully crediting . . . Mr. Martes's allegation of severe pain," Pl. Mem. at 7; (2) the ALJ improperly

applied the treating source rule, id. at 9; (3) the ALJ did not consider the side effects of Martes's

medications in compiling his RFC, id. at 11; (4) the ALJ did not consider Martes's non-severe

impairments in compiling his RFC, id. at 12; and (5) the ALJ improperly applied the Medical-

Vocational Guidelines in finding that Martes was not disabled under the Act, id. at 12.  We

discuss each next.

    A.  Credibility of Claimant's Allegations of Severe Pain

    The ALJ found Martes's "statements concerning the intensity, persistence and limiting

effects of [his left knee and back pain] . . . not entirely consistent with the medical evidence and

other evidence in the record."  R. 17.  The ALJ explained that Martes's treatment "since his

accident has been routine in nature" and that Martes had "shown good improvement with

treatment, including good recovery after a knee surgery."  R. 17.  Additionally, the ALJ noted

that "examination results and . . . his testimony reveal no significant range of motion limitations

or ambulation problems," R. 17, even if, as the ALJ recognized, Martes suffers "periods of significant limitations due to his knee and ongoing back pain that warrant . . . limitations," R. 16. The ALJ also reasoned that the "overall record" and "the opinions provided" failed to support allegations that Martes's left knee and back pain rendered him completely disabled. R. 17.

Martes contends that the ALJ's determination of his credibility was "erroneously" based on "[a] lack of objective medical findings" to support his allegations of "severe pain." Pl. Mem. at 7-9. He argues that "there, in fact, were clinical findings to support [his] claim of severe pain," which the ALJ erroneously ignored or mischaracterized. Id. at 8. He also contends that it was legal error for the ALJ to discredit his complaints of disabling pain based solely on the lack of corroborating objective medical findings. Id. at 8.

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citing Perales, 402 U.S. at 399) (additional citations omitted). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999) (summarizing the holding of and citing with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)). "If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted); accord Them v. Colvin, 2015 WL 10635499, at *13 (S.D.N.Y. Dec. 22, 2015) (upholding ALJ's credibility determination as supported by the record); Vargas v. Astrue, 2011 WL 2946371, at *15

11

(S.D.N.Y. July 20, 2011) (same); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). However, to the extent that an ALJ's credibility finding is not supported by substantial evidence in the record, it should not be upheld. See, e.g., Cardillo v. Colvin, 2017 WL 1274181, at *12 (N.D.N.Y. Mar. 24, 2017) ("[A]n ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record . . . .'") (quoting Osario v. Barnhart, 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006)). Here, because substantial evidence supports the ALJ's credibility determination, it must be upheld.

With respect to the ALJ's assertion that "the claimant's functioning noted in examination results and during his testimony reveal no significant range of motion limitations or ambulation problems," R. 17, this finding is supported by the notes and opinions of treating physician Dr. Norman Sveilich and consulting examiner Dr. Seema Rai, as well as by portions of Martes's testimony. Following arthroscopic surgery on Martes's left knee, Dr. Sveilich diagnosed Martes with a "[l]eft knee ACL sprain grade 1." R. 289.[3] Seven weeks after the surgery, Dr. Sveilich noted that "[p]ain was elicited at the extreme limits of the range of motion," and he observed tenderness on palpation of Martes's knee, but otherwise observed that Martes exhibited normal flexibility and extension of the knee, full strength with no muscle atrophy, and normal gait and stance. R. 327-28. Nine months after surgery, in May 2014, Dr. Sveilich observed that Martes experienced knee pain "throughout the range of motion" and that "ambulation required crutches," but also found that Martes exhibited a full range of motion and had no muscle

_____

[3] "Grade 1" means "[t]he ligament is mildly damaged . . . . It has been slightly stretched, but is still able to help keep the knee joint stable." See American Academy of Orthopaedic Surgeons, Anterior Cruciate Ligament (ACL) Injuries, OrthoInfo, https://orthoinfo.aaos.org/en/diseases--conditions/anterior-cruciate-ligament-acl-injuries.

atrophy, balance issues, or gait and stance issues. R. 331. He also remarked that Martes was "[d]oing well." R. 330. These relatively mild findings are consistent with the ALJ's determination that Martes suffered from no "significant" range of motion limitations, though he might suffer occasional pain upon motion. Dr. Sveilich's May 2014 notation supporting the use of crutches reflects ambulatory limitations, but the ALJ could have looked to Dr. Rai's February 2014 opinion that Martes's use of a cane was "not medically necessary." R. 315. Dr. Rai also observed that Martes could "walk on heels and toes without difficulty," was "[a]ble to rise from [a] chair without difficulty," and exhibited a full range of motion in his back, knees, and neck. R. 315-16. Thus, Dr. Rai's notes and opinions support the ALJ's finding. As for Martes's testimony at the hearing, Martes testified to driving and taking care of his young child except when on Oxycodone, and did not assert any ambulatory or range of motion limitations due to knee and back pain when asked to identify his disabling symptoms. See R. 39-41. This testimony is consistent with the ALJ's finding that Martes experienced no range of motion limitations or ambulatory problems.

Martes contends his doctors observed "limited range of motion" and that he walked with "an antalgic gait," Pl. Mem. at 8, but these remarks either were inconsistent with Dr. Sveilich's and Dr. Rai's notes, or predated significant treatment for Martes's pain. For instance, only one physician, Dr. Emmanuel Lambrakis (Martes's pain management specialist) observed that Martes walked with an antalgic gait "due to muscle spasm on the low back," R. 375, but the notes of Dr. Sveilich and Dr. Rai contradict this finding. It is within an ALJ's discretion to resolve "genuine conflicts in the medical evidence." Veino, 312 F.3d at 588. Here, the ALJ could properly resolve those conflicts in favor of the notes of Dr. Sveilich and Dr. Rai. Similarly, while Dr. Joseph Gorum noted that Martes's "cervical range of motion is restricted

13

and painful," R. 287, that observation preceded significant amounts of physical therapy as well as trigger point injections in the neck and upper back, see R. 281 (trigger point injections), 313 (physical therapy "which helped"). Given that Martes showed no restricted range of motion in his back on later exams, see R. 315-16, the ALJ's reasoning was supported. Martes also directs us to a disability field office examiner report that noted Martes had sitting, standing, and walking "difficult[ies]," id. R. 204, but it is unclear how those remarks translate into functional limitations, and in any event, the ALJ could choose to draw his conclusions from the physicians who examined Martes.

The record also supports the ALJ's assertion that his treatment has been "routine in nature" and that "he has shown good improvement with treatment, including good recovery after a knee surgery." R. 17. Following his arthroscopic knee surgery in September 2013, the operating physician, Dr. Sveilich, recommended that Martes "cease offending physical activity," attend physical therapy, perform "[h]ome exercises for strengthening" and continue using crutches. R. 325, 328, 332, 341, 410. The recommended physical therapy consisted of biking and elliptical and strength training, R. 410, and Martes later told Dr. Seema Rai he does these exercises, as directed by his doctor, and "uses the bike, as well as weights for his legs," R. 313. Dr. Sveilich noted a week after surgery and then nine months after surgery that Martes was "[d]oing well," R. 324, 330, though Martes continued to report pain in his left knee, R. 330. Dr. Sveilich did recommend a second surgery because of "patient's complaints, [the] results of [a] clinical examination with positive orthopedic findings[,] and [a] significant lack of patient's improvement to conservative nonsurgical treatment," R. 333; however, Martes turned down this surgery, R. 38, which in any event was to be only for the purpose of "properly diagnos[ing] [Martes's] condition . . . to provide more specific and maximal effective treatment for the

14

patient," R. 333. Martes later told Dr. Rai that "[h]e has had some improvement with previous physical therapy." R. 313. In the two years after Dr. Sveilich's second recommendation for surgery, the record notes on Martes condition reflect an unchanged course of "conservative treatment," R. 367, consisting of the use of Oxycodone and other pain medications which he said reduced his pain, see R. 366-88. For his back pain, Martes's treatment was limited to pain medication and physical therapy, and one-time trigger point injections. R. 274-75, 313, 366-88. Martes argues that these records "show [his] condition did not improve with treatment and that his severe pain and symptoms remained unchanged." Pl. Mem. at 9. In doing so, Martes relies heavily on the treating notes of his pain management physician, Dr. Lambrakis. Id. Dr. Lambrakis, as Martes notes, "frequently noted that [] Martes was in severe pain," and observed no improvement with treatment or any changes in his condition. Id.; see also R. 366-87 (noting from December 2013 through March 2016 that Martes "continues [with] severe pain on all affected areas" and recording consistent pain levels of 8/ or 9/10). He nonetheless prescribed a conservative course of treatment, consisting largely of Oxycodone and Xanax. See R. 366-87. In any event, Dr. Lambrakis's notes also sharply contrast with the notes of other physicians who largely record moderate levels of pain. See R. 280-81 (Dr. Pavlova recording Martes's pain as 6/10 in July and August 2013), 286 (Dr. Gorum recording Martes's pain as 5/ to 6/10 in August 2013), 324 (Dr. Sveilich recording Martes's pain as 5/10 in September 2013); but see R. 274 (Dr. Pavlova recording Martes's back pain as 9/10 in July 2013 prior to any trigger point injections or physical therapy). Thus, Dr. Lambrakis's notes on Martes's pain to the contrary, the record generally supports the ALJ's finding on Martes's treatment.

As for the "opinions provided," none support Martes's asserted physical limitations. Dr. Rai, whose opinion received "great weight" from the ALJ, R. 16, opined that Martes had "no

limitations," R. 316. Dr. Pavlova opined in July 2013 that Martes was "partially disabled," R. 274, but by August 2013 Dr. Pavlova concluded that Martes was "not disabled," R. 280. Last, Dr. Eli Witt, Martes's treating psychiatrist, only opined on Martes's mental functioning. See R. 336-38. Thus, substantial evidence supports all of the ALJ's reasons for discounting Martes's subjective statements about the disabling effects of his impairments.[4]

Insofar as Martes argues that the objective medical evidence supported his subjective complaints of pain, Pl. Mem. at 7-8; Pl. Reply Mem. at 3, there was also evidence in the record that rebuts this finding. See generally Johnson, 563 F. Supp. 2d at 454 ("If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."). As for his left knee, Martes's surgery did not reveal more than a mild sprain, see R. 289; see also R. 351 (July 2013 MRI indicated knee sprain), and subsequent x-rays and examinations of the knee did not reveal evidence of further degradation in this condition, see R. 316, 319. As for his back, although an MRI of Martes's back revealed herniation with thecal sac compression and mild and moderate neural foramina impingement, R. 352-53, the MRI did not indicate protrusions, sequestrations, annular tears, or spinal stenosis, id., and subsequent x-rays and examinations only confirmed a diagnosis of "straightening," R. 318. The consultative examiner also found no resulting limitations or abnormal results attributable to Martes's back pain. See R. 313-16. On this mixed record, the ALJ did not err in concluding that the objective evidence did not support

_____

[4] Martes also asserts that the ALJ "erroneously found that there was no evidence of nerve root compression," pointing to several MRIs for support of his claim. Pl. Mem. at 8. Martes's brief, however, does not link the alleged error to the ALJ's credibility findings; nor do we see any relevance to a credibility determination. Indeed, the ALJ recognized that "the objective evidence reveals abnormalities in the lumbar [and] cervical spine." R. 17.

Martes's claimed limitations.

Finally, to the extent Martes argues that an ALJ may not rely on objective medical evidence to "discredit complaints of pain," Pl. Mem. at 7-8, we disagree. As previously noted, "it is the function of the Commissioner . . . to appraise the credibility of witnesses, including the claimant." Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012)(alterations omitted) (internal quotation marks omitted) (quoting Carroll, 705 F.2d at 642) (summary order); accord Tejada, 167 F.3d at 775-76. In performing this function, the Commissioner's regulations state that the Commissioner "will consider all of the available evidence, including [a claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]," in making a determination as to the credibility of a claimant's allegations about "the intensity and persistence of [his or her] symptoms." 20 C.F.R. §§ 404.1529(a), 416.929(a); see also 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work."); accord Genier, 606 F.3d at 49 ("at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record") (citation omitted); Tejada, 167 F.3d at 775-76 (After "weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . [the ALJ] may decide to discredit the claimant's subjective estimation of the degree of impairment."). The regulations do provide that the Commissioner "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20

C.F.R. §§ 404.1529, 416.929 (emphasis added). But the ALJ did not run afoul of this part of the regulations in this case. Here, in addition to the objective medical evidence, the ALJ considered Martes's course of treatment, "the opinions provided," and his testimony, in addition to "the medical evidence and other evidence in the record." See R. 17; see generally 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (SSA "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence").

Martes points to Aubeuf v. Schweiker, 649 F.2d 107 (2d Cir. 1981), arguing that it holds that "subjective pain may serve as the basis for establishing disability even if such pain is unaccompanied by positive clinical findings or other 'objective medical evidence.'" Pl. Mem. at 8 (citation omitted). While Aubeuf permits subjective pain to establish disability, Aubeuf does not require an ALJ to accept such testimony. Indeed, Aubeuf did not concern an ALJ's credibility determination, since there the ALJ found the claimant's statements credible. 649 F.2d at 112.

Additionally, case law holds that an ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Barry v. Colvin, 606 F. App'x 621, 622 (2d Cir. 2015) (internal quotation marks omitted) (quoting Genier, 606 F.3d at 49) (summary order); accord Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). The general rule is that "an ALJ need not blindly accept a claimant's subjective claims of pain." Fuller v. Shalala, 898 F. Supp. 212, 217 (S.D.N.Y. 1995). Instead, "[t]he ALJ has the discretion to . . . arrive at an independent judgment . . . , in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." Mims v. Heckler, 750 F.2d 180,

186 (2d Cir. 1984); <u>accord</u> <u>Them</u>, 2015 WL 10635499, at *12 (applying standard and finding

substantial evidence to support ALJ's credibility determination).  Here, the ALJ considered the

evidence and determined that, although Martes suffered ongoing pain, that pain did not prevent

him from performing sedentary work.  R. 17.  The ALJ could permissibly make this credibility

determination.

      B.  <u>Application of Treating Source Rule</u>

      In discussing the record and evaluating Martes's RFC, the ALJ assigned "great weight"

to consulting examiner Dr. Rai's opinion that Martes "had no limitations," R. 16, but "limited

weight" to the opinion of treating source Dr. Pavlova that Martes was "partially disabled" and

"little weight" to the opinion of Dr. Witt concerning the effect of physical pain on Martes's

mental functioning, R. 16-17.  The ALJ did not refer to treating sources Dr. Sveilich, Dr. Gorum,

or Dr. Lambrakis by name, but in summarizing the record the ALJ noted their reports that

Martes had reported ongoing pain to them and noted their treatments or recommendations.  R.

16.  Martes contends the ALJ should have given controlling weight to Martes's treating

physicians "rather than to an outdated opinion from a one-time [consulting examiner]."  Pl.

Mem. at 11.  In so arguing, Martes makes reference only to Dr. Pavlova, Dr. Sveilich, Dr.

Gorum, and Dr. Lambrakis.  <u>See</u> <u>id.</u> at 10.  We find no error in the ALJ's use of her discretion to

resolve conflicts between the medical opinions in the record.

      To start with, the ALJ did not err in according "limited weight" to Dr. Pavlova's opinion

that Martes was "partially disabled."  <u>See</u> R. 16, 274.  The ALJ reasoned that Dr. Pavlova's July

2013 opinion merited little weight because "it was drafted a few days after the claimant's

accident that caused his alleged disability" and thus provided only a snapshot of Martes's

condition before any treatment.  R. 16-17.  It was also contradicted a month later by Dr.

Pavlova's August 2013 opinion that Martes was "not disabled from his previous work." R. 16, 280. Because the July 2013 opinion was quickly contradicted by the August 2013 opinion, and both opinions pre-dated Martes's September 2013 surgery, see R. 289, the ALJ reasonably concluded that the July 2013 opinion was due no more than "limited weight," R. 16. Of course, an ALJ need not defer to a treating source's opinion on the ultimate issue of disability and can discount a vague opinion rendered in simplistic categories of "total, partial, and no" disability, as Dr. Pavlova's opinion was in this case. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("the ultimate finding of whether a claimant is disabled and cannot work" is to be made by the ALJ and "[a] treating physician's statement that the claimant is disabled cannot itself be determinative"); accord Tracynger v. Commissioner, 269 F. Supp. 3d 106, 119 (S.D.N.Y. 2017) (citing cases). Accordingly, the ALJ supplied good reasons for the weight given to Dr. Pavlova's medical opinion and we reject Martes's claim that Dr. Pavlova's earlier opinion deserved controlling weight. Pl. Mem. at 11.

The record also supports the ALJ's reasons for giving "great weight" to Dr. Rai's February 2014 opinion that Martes "had no limitations" and did not need to use a cane. R. 16. As the ALJ wrote, Dr. Rai was "an examining source who provided a full length examination and is familiar with the Agency guidelines on assessing a claimant's functioning." R. 16; see R. 313-17. The ALJ further noted that Dr. Rai's observations of minimal abnormalities on examination and in laboratory results were "consistent with the claimant's complaints that support medium levels of pain but do not purport significant functional limits." R. 16. A review of Dr. Rai's examination confirms these observations. On examination, Dr. Rai observed that Martes could "walk on heels and toes without difficulty," that he "[n]eeded no help changing for [the] exam or getting on or off [the] exam table," and that he was "able to rise from [a] chair

without difficulty." R. 315. A musculoskeletal and neurological examination revealed nothing abnormal, though an x-ray of the back revealed straightening of the lumbosacral spine. R. 315-16, 318. These objective medical observations support Dr. Rai's finding that Martes endured no functional limitations. Moreover, as the ALJ noted, Martes had reported to Dr. Rai that he experiences constant knee pain that he would place as a six or seven on a ten-point scale, which worsens "with bending his knee or walking for extended periods," but also that "[h]e has had some improvement with previous physical therapy" and that he "currently does exercises in the gym, as directed by his physician." R. 313. Martes also reported to Dr. Rai that his back pain was a three to five on a ten-point scale. R. 313. Thus, as the ALJ noted, Dr. Rai's opinion was consistent with Martes's reports of medium levels of pain that do not translate to "significant functional limit[ations]." R. 16.

Dr. Rai's findings were also supported by Dr. Sveilich's observation that Martes was "doing well," R. 324, 330, and the record of only mild objectively verifiable injuries, see, e.g., R. 289-90 (Dr. Sveilich diagnosing Martes with a grade 1 ACL sprain post-operation). On this record, the ALJ reasonably exercised her discretion in affording great weight to Dr. Rai's opinion. See Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he opinions of nonexamining sources [can] override treating source's opinions provided they are supported by evidence in the record."); accord Suttles v. Colvin, 654 F. App'x 44, 46 (2d Cir. 2016) (no error by ALJ to give great weight to consultative examiner's opinion because it was consistent with record evidence) (summary order); Rosier v. Colvin, 586 F. App'x 756, 758 (2d Cir. 2014) (consultative examiner's opinion constitutes substantial evidence supporting ALJ's decision to accord little weight to treating source) (summary order); Mayor v. Colvin, 2015 WL 9166119, at *18 (S.D.N.Y. Dec. 17, 2015) ("An ALJ may give greater weight to a consultative examiner's

opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence."); Suarez v. Colvin, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) (same).

Martes claims Dr. Rai "did not evaluate [his] pain and . . . was unaware of the MRIs that showed [he] had a cervical disc herniation and multiple lumbar disc bulges with impingement." Pl. Mem. at 10. However, the ALJ incorporated such limitations expressly in her decision that Martes "warrant[ed] additional limitations beyond those noted in Dr. Rai's opinion." R. 16. Specifically, after noting what parts of Dr. Rai's opinion were consistent with the evidence, the ALJ noted that the record showed "cervical spine impairments" and that "reveal[ed] that [Martes's] pain has not been completely eliminated." R. 16. Additionally, although Martes asserts that Dr. Rai erred by "not address[ing] whether [he] had side effects from his medications," Pl. Mem. at 10, the record does not support that Martes in fact suffered any side effects at the time of Dr. Rai's examination. See infra Section III.C. Accordingly, the ALJ had no such basis for reducing the weight given to Dr. Rai's opinion. Martes's final claims are that Dr. Rai's opinion merited less weight because it was from two years before the ALJ issued his decision and thus did not include two years worth of information, Dr. Rai "had no treating relationship with him," and Dr. Rai "examined [] Martes only once." Pl. Mem. at 10. Again, the ALJ accounts for these factors in the opinion. R. 16. When discussing why the ALJ believes Martes "warrant[s] additional limitations beyond those noted in Dr. Rai's opinion," the ALJ cites to Martes's "ongoing complaints," "ongoing treatments," and "recent treatment." R. 16. The ALJ also describes Dr. Rai as a consultative examiner who saw Martes only once, on February 6, 2014. R. 16. We thus believe the ALJ already accounted for these factors in her decision to give great, but not controlling weight to Dr. Rai's opinion. As noted, it is within an ALJ's discretion

to resolve "genuine conflicts in the medical evidence." Veino, 312 F.3d at 588.

While Martes did not make the argument, we note that the ALJ did not err by not referring to the opinions of Dr. Sveilich, Dr. Gorum, and Dr. Lambrakis, see Pl. Mem. at 10, given that none of these treating sources actually gave medical opinions — the only statements that are due deference under the treating source rule. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Medical opinions are defined as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Medical opinions do not include the results of objective tests, such as "any clinical or diagnostic techniques." Bailey v. Berryhill, 2017 WL 1102671, at *2 (S.D.N.Y. Mar. 24, 2017) (quoting Peach v. Astrue, 2009 WL 7113220, at *5 (N.D.N.Y. Dec. 3, 2009)). They also differ from "mere treatment notes," which "merely list the symptoms detailed by the Plaintiff and/or the tests performed by the doctor." Wider v. Colvin, 245 F. Supp. 3d 381, 390-91 (E.D.N.Y. 2017); see also Bailey, 2017 WL 1102671, at *2 (not medical opinion if only "treatment notes documenting Plaintiff's medical history, describing the results of examinations and medical tests, and describing treatments and treatment plans."). They instead "must reflect a judgment 'with regard to the nature and severity of plaintiff's limitations beyond a mere diagnosis and description of the symptoms.'" Bailey, 2017 WL 1102671, at *2 (quoting Merriman v. Comm'r of Soc. Sec., 2015 WL 5472934, at *20 (S.D.N.Y. Sept. 17, 2015)). The records from Dr. Gorum consist mostly of his diagnosis — "Herniated disk of the neck. Back pain. Knee Pain, and ACL tear" — and his recommendation that Martes undergo knee surgery. R. 285-86. Dr. Gorum did not assess Martes with any functional limitations. Id. Likewise, Dr. Lambrakis treated Martes for

pain from December 2013 to February 2016, but his notes are largely limited to recording Martes's subjective complaints and noting his recommendations for treatment. See R. 366-88. Most extensive are Dr. Sveilich's notes, which include a surgical report, a resulting diagnosis, R. 289-90, and periodic updates on Martes's recovery in which Dr. Sveilich reports Martes's complaints of pain, describes the results of a battery of medical tests, and provides an outline of Martes's treatment plan, see R. 289-90, 324-25, 327-28, 330-34, 340, 346, 394, 397, 410. Because these records are all limited to recording Martes's subjective complaints, describing the results of any medical tests, and outlining treatment strategies, however, they qualify as treatment notes and not medical opinions because they do not "reflect judgments about the nature and severity of [Martes's] impairment(s)," 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Thus, the ALJ did not need to assign them any weight in discussing the medical record. See Bailey, 2017 WL 1102671, at *2.

C. Consideration of the Side Effects of Medication

Martes claims that the ALJ erred in not considering the impact of side effects of medication on his RFC. Pl. Mem. at 11-12. At his hearings before the ALJ, Martes claimed he experiences incoherence, difficulty walking, dizziness, and memory problems as a result of taking Oxycodone. R. 37-38. He also separately reported drowsiness or a general fatigue from his medications. R. 41, 358. The record shows that Martes was also prescribed Flexeril, Motrin, Voltaren, and Xanax. R. 374, 378, 388. Martes notes that his reported symptoms are consistent with the listed side effects for these drugs. Pl. Mem. at 3 nn.2-3, 5 nn. 4-5.

Social Security regulations require the Commissioner to consider "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv). However, those

24

regulations also expressly state:

> statements about your pain or other symptoms will not alone establish that you
> are disabled. There must be objective medical evidence from an acceptable
> medical source that shows you have a medical impairment(s) which could
> reasonably be expected to produce the pain or other symptoms alleged and that,
> when considered with all of the other evidence (including statements about the
> intensity and persistence of your pain or other symptoms which may reasonably
> be accepted as consistent with the medical signs and laboratory findings), would
> lead to a conclusion that you are disabled.
> . . .
> Your symptoms, such as pain, fatigue, shortness of breath, weakness, or
> nervousness, will not be found to affect your ability to do basic work activities
> unless medical signs or laboratory findings show that a medically determinable
> impairment(s) [which could reasonably be expected to produce the pain or other
> symptoms alleged] is present.

20 C.F.R. §§ 404.1529(a)-(b), 416.929(a)-(b). As explained in SSR 16-3p, 2017 WL 5180304

(S.S.A. Oct. 25, 2017), an ALJ must evaluate claimed symptoms "using a two-step process set

forth in [20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)]." 2017 WL 5180304, at *2;

accord Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order). The factors at

step two include a consideration of side effects, but they also include daily activities, reported

pain or other symptoms, "precipitating and aggravating factors," treatment besides medication,

coping measures the claimant uses, and "[o]ther factors concerning [the claimant's] functional

limitations and restrictions due to pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3)(i)-

(vii), 416.929(c)(3)(i)-(vii); see also SSR 16-3p, 2017 WL 5180304, at *4-9 (explaining various

factors that ALJs may consider in evaluating an individual's symptoms).

In this case, the ALJ did not expressly address in her decision Martes's alleged side

effects. Martes argues this is a ground for remand. Pl. Mem. at 11-12. An ALJ need not,

however, explicitly address each and every statement made in the record that might implicate her

evaluation of a claimant's credibility as long as "the evidence of record permits us to glean the

rationale of an ALJ's decision." Cichocki, 534 F. App'x at 76 (quoting Mongeur, 722 F.2d at 1040); see also Colbert v. Comm'r of Soc. Sec., 313 F. Supp. 3d 562, 580 (S.D.N.Y. 2018) (while the ALJ's credibility determination "did not explicitly address the side effects of [the claimant's] medications, there is ample evidence in the opinion and the record to 'glean the rationale of the ALJ's decision'") (citation omitted); accord Franklin v. Colvin, 2018 WL 1449524, at *8 (S.D.N.Y. Mar. 23, 2018); Guilfuchi v. Comm'r of Soc. Sec., 2016 WL 128207, at *10 (S.D.N.Y. Jan. 12, 2016). In this case, the record contains no corroborating information for Martes's alleged side effects. The record does contain a single report that Martes reported "lack of sleep and general lethargy," R. 358, but the report does not link these symptoms to Martes's medications, id. Instead, the record contains information contradicting Martes. Dr. Gorum, for instance, described him in August 2013 as "awake, alert, and orientated," R. 286; Martes denied in his Function Report having "trouble remembering things," R. 226; and Dr. Rai reported that Martes watches TV, listens to the radio, reads, socializes with friends, and plays video games with his children, R. 314. Given that the ALJ wrote that she did not find Martes's testimony "consistent with the medical evidence" and that "the overall record does not support his allegations," R. 17, we conclude that the ALJ considered Martes's claim of debilitating side effects and found it wholly unsupported. Given the lack of any medical records corroborating Martes's claimed side effects, we find no error in the ALJ's decision not to incorporate the side effects into a discussion of Martes's RFC or into the resulting RFC itself. See Sabater v. Colvin, 2016 WL 1047080, at *6-7 (S.D.N.Y. Mar. 10, 2016) (side effects not supported by the record).

Martes cites Arias v. Astrue, 2012 WL 6705873 (S.D.N.Y. Dec. 21, 2012), and Mielnicki v. Astrue, 2009 WL 1813227 (N.D.N.Y. June 4, 2009), in support of the principle that courts should reverse decisions that give "insufficient consideration" to a claimant's side effects or fail

to explain the omission of such side effects from a discussion of the claimant's RFC. Pl. Mem. at 11. But Arias is distinguishable because the ALJ in Arias ignored what the court characterized as "potentially significant factors" and omitted certain testimony "without explanation." 2012 WL 6705873, at *3-4. Similarly, in Mielniki v. Astrue, 2009 WL 1813227 (N.D.N.Y. June 4, 2009), a treating source had opined that the side effects of the claimant's medication "would severely limit her effectiveness," corroborating the claimant's testimony, but the court there found it "unclear from the ALJ's decision why he failed to include any limitations from plaintiff's side effects . . . in his RFC analysis." 2009 WL 1813227, at *6. Here, in contrast to Arias and Mielnicki, the record does not support Martes's claimed side effects and the ALJ explained that she did not find his testimony entirely credible. See R. 17. The ALJ therefore did not omit a discussion of "potentially significant factors" without explanation, and we can "glean the rationale," Mongeur, 722 F.2d at 1040, of the ALJ's decision to omit any limitations due to alleged side effects of Martes's medications.

D.  Consideration of Non-Severe Impairments When Compiling RFC

Martes asserts that the ALJ failed to consider his non-severe impairments — specifically, the effect of his diagnosis for "adjustment reaction disorder with mixed emotional features" and high blood pressure — in reaching an RFC determination. Pl. Mem. at 12. Martes asserts this was error because an ALJ must consider all impairments, both severe and non-severe, together when determining a claimant's RFC. Id.

We disagree with Martes's reading of the ALJ's decision. The ALJ stated that although she found the impairments mentioned non-severe — as well as a right shoulder injury, and childhood asthma— she had "considered these impairments when drafting the residual functional capacity outlined below." R. 14. In other words, the ALJ omitted additional

27

limitations in Martes's RFC relating to the non-severe impairments because she found that the non-severe impairments did not cause greater limitations than those already included the RFC. In fact, the ALJ extensively discussed Martes's diagnosis of adjustment reaction disorder at step three of his analysis, see R. 13-14, and discussed Martes's treating psychologist Dr. Witt's opinion concerning Martes's functional limitations when weighing the medical evidence relevant to the RFC determination, R. 17. The ALJ, however, concluded that Martes "is mentally capable of performing substantially all unskilled jobs," including by "understanding, carrying out and remembering simple instructions; us[ing] judgment; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting." R. 13. The ALJ similarly concluded that despite Martes's diagnosis for high blood pressure, "the record supports only routine treatment with no symptoms, complications or significant limitations caused by this condition." R. 13. Any elevated readings, the ALJ reasoned, were due to Martes's conceded noncompliance with his medication protocols. Id. The ALJ further noted that Martes has no ongoing symptoms as a result of his childhood asthma and right shoulder repair. Id. Thus, given these conclusions, no limitations greater than those in the RFC were appropriate.

We also note that these conclusions are supported by the record. As to Martes's mental limitations, his therapist's notes show that Martes reported feeling depressed, struggling with sleep and relationships, and feeling lethargic; yet his therapist recommended only therapy, stating that medication was unnecessary and even noting "some improvement" and "mild improvement" after two psychotherapy sessions. R. 358-63. Martes also attended only six psychotherapy sessions over the course of fourteen months, id., and when his therapist was asked to opine on Martes's functional limitations, the therapist noted only "mild" impairments in

28

Martes's social functioning.  R. 336-37.  While the therapist did opine that Martes endured "extreme" limitations in his ability to understand, remember, and carry out instructions, the therapist attributed those impairments exclusively to Martes's "pain."  Id.  Thus, the record reflected no or minimal limitations attributable to Martes's diagnosis for adjustment reaction disorder.

As to Martes's high blood pressure, Martes told Dr. Rai that he was non-compliant with his blood pressure medication and that his physician had recently directed him to start taking his medication as directed.  R. 314.  He denied any history of a transient ischemic attack (i.e., a mini-stroke), a stroke, or myocardial infarction.  R. 314.  Martes likewise denied any recent asthma flare-ups, R. 314, and the record is silent on Martes's shoulder repair.  Because substantial evidence supports the ALJ's decision to omit limitations relating to Martes's non-exertional impairments from his RFC, there is no basis on which to remand for further consideration of Martes's non-exertional impairments in the RFC analysis.

E.  Application of the Medical-Vocational Guidelines to Martes

Martes argues that the ALJ erred in applying the Medical-Vocational Guidelines (commonly known as "the Grids") because the ALJ did not "cite examples of any occupations that an individual with [his] RFC . . . could do," as required according to SSR 96-9p.  Pl. Mem. at 12-13.  He further contends that the ALJ "should have obtained the testimony of a vocational expert to provide examples of limited sedentary jobs . . . that an individual with the ALJ's formulated RFC could do."  Id. at 14.

An ALJ is not precluded from exclusively using the Grids.  See Merriman v. Comm'r of Soc. Sec., 2015 WL 5472934, at *13 (S.D.N.Y. Sept. 17, 2015).  "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert"

or "preclude reliance on the [Grids]." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986). The testimony of a vocational expert is required only where the "claimant's nonexertional impairments significantly diminish his ability to work." Id.; accord Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004); Merriman, 2015 WL 5472934, at *13. "'[S]ignificantly diminish' . . . mean[s] the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp, 802 F.2d at 606; accord Selian, 708 F.3d at 421; Zabala v. Astrue, 595 F.3d 402, 411 (2d Cir. 2010).

The ALJ assessed Martes with suffering from the following non-exertional impairments: a restriction to "occasionally climbing, balancing, kneeling, stooping, crouching and crawling" due to his knee and back problems. R. 15. Martes asserts that he also suffers from the following additional non-exertional impairments: "need for a hand-held assistive device," Pl. Mem. at 13, "the effects of [his] non-severe impairments," "the side effects of his medications," and "the non-exertional limitations due to pain as noted by Dr. Witt," id. at 14. With respect to Martes's asserted need for a hand-held assistive device, the ALJ rejected Martes's asserted use of a cane finding that the record did not support it. R. 16. In doing so, she relied on Dr. Rai's opinion that use of a cane was not medically necessary. R. 315. We thus find no error in the ALJ's conclusion that Martes's professed use of a cane did not deprive him of a meaningful employment opportunity. See Suarez v. Colvin, 2014 WL 5099207, at *12 (S.D.N.Y. Oct. 1, 2014) ("an ALJ certainly is not required to incorporate restrictions into the RFC or pose a hypothetical to [a vocational expert] that [is] not supported by the record.") (citation and internal quotation marks omitted). Concerning his non-severe impairments, we also find no error in the ALJ's conclusion that those impairments did not significantly diminish Martes's ability to work.

30

As noted above, the ALJ found that Martes "is mentally capable of performing substantially all unskilled jobs," that his high blood pressure caused no significant limitations, and that his past shoulder injury and childhood asthma presented no ongoing symptoms or limitations.  R. 13. See Selian, 708 F.3d at 422 (where claimant suffered from depression, ALJ could still conclude that the claimant could perform the "basic mental demands of unskilled work, such as following simple instructions, and responding appropriately to supervisors and coworkers in usual work situations") (citation and internal quotation marks omitted).  As to the side effects of his medications, the ALJ found Martes's testimony not credible and unsupported by the record. R. 17.  We thus see no error in the ALJ's determination that side effects due to Martes's medications did not cause more than a negligible loss of work capacity.  Cf. Selian, 708 F.3d at 421-22 (because "the ALJ declined to find Selian's testimony about his pain credible," the court found "no error in the ALJ's conclusion that pain did not deprive Selian of a meaningful employment opportunity").  Likewise, because the ALJ gave Dr. Witt's testimony "little weight" as it was "inconsistent with the record" and "purely based on subjective complaints," R. 336-37, the ALJ did not err in finding that Martes's mental impairments did not diminish his work capacity, Selian, 708 F.3d at 421-22.  Instead, the ALJ accepted that Martes experienced certain physical limitations due to knee and back pain and accounted for them in finding Martes limited to sedentary occupations with additional restrictions on climbing, balancing, kneeling, stooping, crouching and crawling.  R. 16.

With respect to Martes's non-exertional limitations, the ALJ concluded that the limitations "have little or no effect on the occupational base of unskilled sedentary work."  R. 18. The ALJ relied on SSR 96-9p, which provides that "[p]ostural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or

crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." SSR 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996). It also provides that a "restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work." Id. at *8; see also SSR 85-15, 1985 WL 56857, at *6-7 (S.S.A. Jan. 1, 1985) (where "a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. . . . If a person can stoop occasionally . . . in order to lift objects, the sedentary and light occupational base is virtually intact."); SSR 83-14, 1983 WL 31254, at *4-5 (S.S.A. Jan. 1, 1983) ("nonexertional limitations or restrictions which have very little or no effect on the unskilled light occupational base" include "inability to ascend or descend scaffolding, poles, and ropes; inability to crawl on hands and knees . . . ."). In Selian, the Court remanded the case for the ALJ to "obtain testimony from a vocational expert," because "the ALJ did not affirmatively determine whether or not [the claimant's] reaching limitation was negligible, despite finding that [the claimant] could reach only 'occasionally.'" 708 F.3d at 422. Here, since the ALJ affirmatively determined that Martes's postural limitations due to pain "have little or no effect on the occupational base of unskilled sedentary work," R. 18, we find no such error. See Rodriguez v. Colvin, 2016 WL 1178780, at *15 (S.D.N.Y. Mar. 25, 2016) ("limitations to occasionally climbing ramps, stairs, ladders, and scaffolds, stooping, kneeling, crouching, crawling, pushing, pulling and operating foot controls, and occasional exposure to unprotected heights, moving mechanical parts and operating motor vehicles" did not preclude reliance on the Grids); Rosario v. Astrue, 2013 WL 3324299, at *2, *6, *9 (S.D.N.Y. June 25, 2013) ("mild limitations in walking distances due to fatigue, and mild limitations in prolonged standing, sitting, and climbing stairs due to back

pain," in addition to "moderate difficulties in concentration, persistence or pace" did not preclude use of the Grids); Vargas v. Astrue, 2011 WL 2946371, at *6, *12-13 (S.D.N.Y. July 20, 2011) ("moderate limitations with lifting, carrying, handling objects, and climbing stairs," as well as "moderate limitations in maintaining attention and concentration for complex tasks" did not prelude use of Grids); accord Peralta v. Colvin, 2015 WL 1505708, at *9 (N.D.N.Y. Mar. 31, 2015); Wasiewicz v. Colvin, 2014 WL 5465451, at *6 (W.D.N.Y. Oct. 28, 2014); Stanton v. Barnhart, 2003 WL 1900855, at *7 (S.D.N.Y. Apr. 17, 2003).

Martes argues that the ALJ's finding "runs against Social Security Rulings," Pl. Mem. at 13, citing SSR 96-9p, which states:

> "balancing" means maintaining body equilibrium to prevent falling when walking, standing, crouching, or running on narrow, slippery, or erratically moving surfaces.  If an individual is limited in balancing only on narrow, slippery, or erratically moving surfaces, this would not, by itself, result in a significant erosion of the unskilled sedentary occupational base.  However, if an individual is limited in balancing even when standing or walking on level terrain, there may be a significant erosion of the unskilled sedentary occupational base.  It is important to state in the RFC assessment what is meant by limited balancing in order to determine the remaining occupational base. Consultation with a vocational resource may be appropriate in some cases.

1996 WL 374185, at *7.  Here, the ALJ did not say that Martes could not "balance" but merely that he should only "occasionally" balance (and also only occasionally, climb, kneel, stoop, and crawl).  R.  15.  Moreover, the record does not support any "balancing" limitations.  Dr. Sveilich, a treating source, noted on several occasions that Martes's balance was normal.  R. 331, 341, 344.  Likewise, while Dr. Rai noted that Martes uses a cane "for balance," she opined that the cane was medically unnecessary.  R. 315.  Notably, Martes points us to no contrary evidence in the record.  Cf. Dahl v. Comm'r of Soc. Sec., 2013 WL 5493677, at *7 (N.D.N.Y. Oct. 1, 2013)

(the ALJ "could rely on SSR 96–9p itself to find that dizziness or lightheadedness when sitting does not ordinarily erode one's occupational base for sedentary work.").

Martes argues that the ALJ erred because the ALJ did not "cite examples of any occupations that an individual with [his] RFC . . . could do." Pl. Mem. at 13. In support of his argument, Martes quotes SSR 96-9p, which provides that "the adjudicator must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides." Id. But this Social Security Ruling says that such examples are required only "where there is more than a slight impact on the individual's ability to perform the full range of sedentary work." 1996 WL 374185, at *5. Here, as explained above, the ALJ properly declined to cite examples of such jobs because she concluded that Martes's non-exertional limitations had "little or no effect on the occupational base of unskilled sedentary work." R. 18. We thus find no error.

IV. CONCLUSION

For the foregoing reasons, Martes's motion for judgment on the pleadings (Docket # 17) is denied and the Commissioner's motion for judgment on the pleadings (Docket # 19) is granted.

SO ORDERED.

Dated: New York, New York
       November 2, 2018

GABRIEL W. GORENSTEIN
United States Magistrate Judge

34